IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:04CR3159 |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL SIWEK, | ) | REPORT, RECOMMENDATION, |
| | ) | AND ORDER |
| Defendant. | ) | |
| | ) | |

   The defendant moves to suppress all evidence obtained during the search of his vehicle on November 12, 2004.  Filing 17. Siwek has also moved to suppress statements allegedly obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966) and the Fifth and Sixth Amendments.  Filing 18.

   At the close of the evidentiary hearing the government conceded that the defendant was not advised of his Miranda rights prior to making "off-the-record" statements to Investigator Lyon and "there's no question that those [statements] can't be offered in the government's case in chief."  See filing 29 (transcript) at 104-105, and exhibit 8.  After being advised of his rights, the defendant refused to answer questions and invoked his right to counsel.  See exhibit 3.

   Therefore, based on the parties' stipulation, I shall not further discuss the defendant's Fifth and Sixth amendment claims and shall recommend that the defendant's motion to suppress statements, filing 18, be granted.  I conclude, however, that the defendant's motion to suppress physical evidence found during the search of his vehicle, filing 17, should be denied.

FACTUAL FINDINGS

On November 12, 2004 Nebraska State Patrol Trooper Greg Goltz conducted a selective enforcement operation at the Giltner interchange of Interstate 80 in Hamilton County, Nebraska. Trooper Goltz has been an NSP trooper for seventeen years and has received extensive drug interdiction and investigation training. See ex. 5.  He has been patrolling the area that includes Interstate 80 in Hamilton County, Nebraska for the last six years.

Interstate 80 through Hamilton county is flat and straight, with two eastbound and two westbound lanes separated by a twenty-five foot median.  The Giltner interchange in Hamilton County consists of four ramps providing access to and egress from the interstate.  The interchange has both eastbound and westbound exit ramps that access Highway 41B, which is a north/south roadway that crosses over the interstate and connects with Highway 34 a few miles north of the interstate, and with the town of Giltner south of the interstate.

A residence is located about one-sixteenth of a mile south of the Giltner interchange.  There is a small one-car abandoned and dilapidated garage placed on a large abandoned parking lot on the northeast corner of the interchange, and a farm is located about one-sixteenth of a mile north of the parking lot.  There are no blue service signs or advertisements indicating that a restaurant can be accessed by exiting the interstate at the Giltner interchange.  The only sign for eastbound interstate traffic at the Giltner interchange is a green highway sign identifying it as the Giltner and Highway 41B exit.

On November 12, 2004 Trooper Goltz posted several signs west of the Giltner exit warning eastbound interstate drivers that they were approaching a checkpoint ahead on I-80.  The posting of these signs was a ruse--there was no checkpoint.  Trooper Goltz then stationed himself near the eastbound exit ramp at the Giltner interchange.  Although Trooper Goltz used the checkpoint ruse to lure drivers conducting illegal activity off the interstate, he did not stop every vehicle that exited the interstate at the Giltner interchange; he initiated a traffic stop only when he witnessed a traffic violation.

Two stop signs were located at the junction of the eastbound interstate exit ramp of the Giltner interchange and Highway 41B; one on the right for those heading south, and one on the left for those heading north on Highway 41B.  Trooper Goltz could visually monitor eastbound vehicles that exited the interstate from the confines of his patrol vehicle, which was located approximately thirty feet to the south of the eastbound ramp near a grove of trees.  See ex. 6.

At approximately 12:50 p.m. Trooper Goltz saw the defendant's vehicle, a silver 2001 Chevrolet quad cab (four-door) pickup with Minnesota plates, exit the interstate.  See ex. 4 (photographs), p. 1.  The pickup's bed had a hard tonneau cover.[1]  See ex. 4 (photographs), pp. 2 & 4.  The defendant approached the top of the exit, stopped, and turned right on the Giltner spur.  Trooper Goltz followed the vehicle, manually activating his video recorder at 12:54 p.m. and thereby capturing on videotape the events relevant to the defendant that occurred as the defendant

---

[1]A tonneau cover is a solid, non-transparent cover designed to be placed on top of a pickup bed.  Tonneau covers are equipped with locks to secure the contents of the pickup bed.

3

entered Giltner and after he stopped and contacted Trooper Goltz.  See ex. 1.  By the time the defendant's vehicle stopped for the railroad crossing about a mile from Giltner, the trooper was able to see the vehicle's license plate number.  He ran the plate to see if the vehicle was properly registered.

   Dispatch advised  Trooper Goltz that the license plate number on defendant's vehicle was not found in Minnesota's computer files.  The trooper continued to follow the vehicle into the town of Giltner, but he never initiated a traffic stop.  The defendant stopped his vehicle at a T-type intersection near the high school in Giltner, got out of the vehicle, and approached Trooper Goltz' patrol car.

   Trooper Goltz rolled down his window and asked the defendant if he was lost.  The defendant responded that he was looking for a restaurant because he had seen a sign on the interstate that said "eats."  The trooper responded that there was neither a restaurant in Giltner nor a sign for a restaurant on the interstate.

   Trooper Goltz exited his patrol vehicle and walked toward the defendant.  He advised the defendant that the vehicle plates were not on file in Minnesota's database and asked the defendant if he owned the vehicle.  The defendant responded that he had just purchased the vehicle and retrieved insurance paperwork from the vehicle cab which identified the defendant as the vehicle owner.  Trooper Goltz also obtained defendant's driver's license. See exhibit 2.

   The defendant and Trooper Goltz discussed the origin, destination, and purpose of the defendant's trip.  The defendant stated he was on vacation, had driven a friend to Denver, and was

now returning to his home in Robbinsdale, Minnesota. The trooper explained that when drug interdiction signs are placed on the interstate, the people who exit that interchange are usually either living in the area or transporting something illegal. The defendant shook his head and acknowledged he understood. Trooper Goltz advised the defendant that in order to perform his job well, the trooper needed to ask the defendant if the vehicle contained anything illegal.

Although the defendant initially appeared relaxed when talking to the officer, his demeanor changed significantly when Trooper Goltz asked specific questions about the vehicle's contents. When asked if there was any stolen property in the vehicle, the defendant turned his body away from the officer, put something back into the pickup, and then denied that it contained anything stolen. When Trooper Goltz asked if there was cocaine in the vehicle, the defendant did not maintain eye contact with the officer, laughed, and said "no, no, can't do that." Upon questioning about marijuana, the defendant did not look directly at Trooper Goltz when denying the possession of marijuana.

Trooper Goltz asked "Do you have any problem if I were to search to make sure that's all okay?" The defendant said, "No" and shook his head accordingly. No written consent was obtained, and the defendant was never advised that he could refuse to consent or that he was free to leave. However, his consent is audible on the videotape, (see ex. 1 (videotape) at 12:58:35), and although the defendant spoke frequently with the officer while at the scene and his movement was not restrained prior to arrest, the defendant made no effort to withdraw his consent to the search or stop the search at any time.

5

When Trooper Goltz attempted to search the contents of the pickup bed, he found the tonneau cover was locked.  He asked the defendant for a key, but the defendant claimed the seller was mailing it to him and he had not yet received it.  Trooper Goltz asked if he could see the inside of the defendant's pockets.  The defendant agreed to this request and pulled out his pockets.  The pockets contained neither contraband nor any keys.  In the numerous conversations about the pickup bed that day, the defendant assured the officer that there was nothing stored under the tonneau cover, but he also admitted he was unsure if there was anything stored in the pickup bed because he was never given a key and had never looked under the cover.

Trooper Goltz suspected the defendant was engaging in criminal activity because the defendant's demeanor had changed upon questioning; he claimed he exited the interstate at the Giltner interchange because he saw restaurant signs, but such signs did not exist; he did not have a key to the back cover of the pickup and admitted he had bought the pickup without ever opening that cover; and in Trooper Goltz' experience, marijuana is sometimes transported in pickup beds secured from sight and locked under tonneau covers.  Trooper Goltz advised the defendant that he was calling a locksmith and a drug dog to determine what was in the pickup bed.  The defendant appeared very nervous and started to rub his head.  Trooper Goltz immediately called for a drug dog.  This call was made a few minutes after 1:00 p.m., and at 1:07 p.m., the trooper was advised that a canine handler had been located and would be en route.

Trooper Goltz continued his search of the pickup and found an envelope in the cab with handwritten directions of a route that began with Interstate 35 out of Minnesota and continued on to Albuquerque, New Mexico and then to Phoenix, Arizona.  See ex.

4 (photographs), pp. 2 & 4.  The trooper tried to smell the contents of the pickup bed by smelling at the seal of the tonneau cover and bed frame, an action that was clearly visible to the defendant as he sat in the trooper's patrol vehicle.

The trooper then returned to speak with the defendant and asked him about the directions found the vehicle.  The defendant stated he had considered driving to Albuquerque and Phoenix to shop for a trailer, but decided against that and drove only as far as Denver.  Trooper Goltz advised the defendant that he could smell what was in the pickup bed.  This statement was not true, but the trooper wanted to see how the defendant would react.  The trooper noted nothing suspicious about the defendant's response.

Trooper Goltz asked the defendant how many miles the pickup had when the defendant purchased it.  The defendant claimed he did not know.  The trooper began placing calls in an attempt to determine if the vehicle was properly licensed and if the mileage at purchase compared to the vehicle's current odometer reading corresponded with the anticipated distance of a Minnesota-to-Denver road trip.

Hamilton County Sheriff Deputy Rust and NSP Lieutenant Kolb arrived at approximately 1:30 p.m.  Shortly thereafter, Trooper Goltz was advised by dispatch that the vehicle was properly licensed, but no mileage information was available from Minnesota authorities.  At approximately 1:42 p.m., Trooper Goltz released some air from the pickup's tires in an attempt to smell for contraband.  He smelled nothing suspicious.

At approximately 1:44 p.m., Trooper Goltz slid under the pickup bed to search for any access to the area under the locked tonneau cover.  He found drain holes, diameters slightly less

7

than a dime, located behind the driver's seat area.  When he inserted a wire hanger into a drain hole as a probe, it touched something.  When he could not move it, he thought  something heavy was located in the bed.  With Lieutenant Kolb's flashlight, he looked into the drain holes and saw what appeared to be green plastic wrap.  See exhibit 4 (photographs), p 3.  From past experience the officer knew bundles of marijuana are commonly wrapped in clear or green plastic wrap.  The wrap is intended to seal in any odor, but drug dogs can detect the scent of illegal drugs secured in sealed containers and plastic wrap.  Wrapping marijuana in plastic wrap is not an effective means of masking its odor from canine detection.

     After Trooper Goltz noted the presence of plastic wrapped contents in the pickup bed, he stuck the metal hanger wire back through the drain hole.  He intended to only move the object above, but he perforated the plastic wrap and  the end of the wire entered the wrapped package.  He withdrew the wire and saw a green substance on the end.  Trooper Goltz and Lieutenant Kolb smelled the substance and recognized the odor of marijuana.

     The defendant was immediately arrested and handcuffed.  A field test was conducted a few minutes later.  The green substance on the hanger tested positive for marijuana.  Following the arrest, Trooper Goltz did not advise the defendant of his <u>Miranda</u> rights.

     NSP Trooper Mike Korte was the canine officer located the closest to Giltner when dispatch received Trooper Goltz' request for canine assistance.  Trooper Korte was at his home in Grand Island, Nebraska with his children.  He arranged for and delivered his children to a babysitter, returned home, retrieved his canine partner, Maximus, and left his residence to drive the

8

nineteen miles to the Giltner interchange.  He arrived at the scene of the stop approximately fifty minutes after Trooper Goltz requested canine assistance (or at about 2:00 p.m.).

Upon arriving at the scene, Trooper Korte promptly dispatched Maximus to perform a canine sniff.  Maximus profoundly alerted to the presence of illegal drugs and then indicated that the strongest source of the odor was located in the pickup bed.

## ANALYSIS

The defendant claims his Fourth Amendment rights were violated in that he did not consent to a search of the pickup; the length of his detention was unreasonable; Trooper Goltz' act of puncturing the green plastic wrap and examining a sample of that package was an unlawful warrantless search without probable cause; and absent this unlawful search, the marijuana in the pickup bed would not have been found.

I conclude, however, that the defendant's Fourth Amendment rights were not violated.  Specifically I find:  1) the defendant consented to a search of his vehicle, and Trooper Goltz did not exceed the scope of that consent either in terms of the areas searched or the duration of the search; 2) even if the defendant did not consent to a search of the pickup bed, the marijuana would have inevitably been discovered; and 3) Trooper Goltz was conducting a reasonable investigation of the defendant's license plates, was authorized to detain the vehicle during that investigation, developed reasonable suspicion of illegal activity during the course of this investigation, detained the defendant's vehicle for a reasonable period while awaiting a drug dog, and the drug dog alerted to the presence of illegal drugs.

1.   Consent to Search.

In arguing lack of consent, the defendant claims his consent was not knowingly and voluntarily given; any consent provided allowed the officer to search only the pickup cab and did not permit prolonged detention of the vehicle; and even if the officer understood the consent to extend to not only the cab but the pickup bed, the defendant's refusal to open the locked tonneau was an implied withdrawal of any consent to search that area.

The precise question is not whether the defendant consented subjectively to Trooper Goltz' search of the entire pickup, nor whether the trooper actually believed he consented, but rather whether a reasonable officer under the circumstances would believe that he provided a valid consent. United States v. Jones, 254 F.3d 692, 695 (8th Cir. 2001); United States v. Sanchez, 156 F.3d 875, 878 (8th Cir. 1998). (See also, Illinois v. Rodriquez, 497 U.S. 177, 188, 110 S.Ct. 2793, 2801 (1990)). The Government has the burden of proving by a preponderance of the evidence that the defendant actually consented to the search of the pickup box or that Trooper Goltz' belief that he did was reasonable.   Id.; United States v. Miller, 20 F.3d 926, 930 (8th Cir. 1994).

The Eighth Circuit has clearly summarized the analysis required in determining if the defendant voluntarily consented to a search.

> The voluntariness of consent is a question of fact to be determined by examining the totality of the circumstances in a given case . . . . The following factors relating to the person giving consent may be relevant in determining the voluntariness of consent:

10

> (1) the defendant's age; (2) the defendant's general intelligence and education; (3) whether the defendant was under the influence of drugs or alcohol; (4) whether the defendant was informed of his <u>Miranda</u> rights prior to consent; and (5) whether the defendant had experienced prior arrests so that he was aware of the protections the legal system affords to suspected criminals. . . . Characteristics of the environment in which consent was given include: Whether the person who consented: (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred. . . . The factors set forth above should not be applied mechanically. . . . Rather, the inquiry turns on the totality of the circumstances, which must demonstrate that the police reasonably believed the search to be consensual. . . .

<u>United States v. Mancias</u>, 350 F.3d 800, 805 (8th Cir. 2003).

The defendant, whose primary language is English, was able to easily communicate with Trooper Goltz. The videotape reflects that the defendant appeared to be of normal intelligence and did not appear to be under the influence of drugs or alcohol. He was apparently able to pass the testing required to obtain a commercial driver's license, determine travel routes, and carry out the responsibilities of a trucking occupation. His stated consent to search occurred less than four minutes after he voluntarily stopped his vehicle to speak with Trooper Goltz. The stop occurred on a public street in Giltner during daylight hours. The defendant was not detained, threatened, or promised anything in exchange for his consent to search the pickup, and he never said or did anything to object to the search. Under the totality of these circumstances, I conclude his consent to search was freely given and was not the product of coercion.

The defendant claims, however, that the consent to search extended only to the pickup cab and his vehicle was unreasonably detained to carry out that search.  A consensual search may not legally exceed the scope of the consent supporting it.  <u>Walter v. United States</u>, 447 U.S. 649, 656-57 (1980).  The scope of a suspect's consent is determined by an 'objective' reasonableness standard.  The question is "what would the typical reasonable person have understood by the exchange between the officer and the suspect?"  <u>Florida v. Jimeno</u>, 500 U.S. 248, 251 (1991).  An individual consenting to a vehicle search should expect the search to be thorough, (<u>United States v. Alverez</u>, 235 F.3d 1086, 1088-89 (8th Cir. 2000), and that such a search may last at least an hour.  See <u>United States v. Alcantar</u>, 271 F.3d 731, 738 (2001).  "[W]hen the police receive consent to search for items that can be hidden in different parts of a car, searching those areas is 'objectively reasonable.'"  <u>Alcantar</u>, 271 F.3d at 738.

Trooper Goltz asked the defendant if he had weapons, stolen property, cocaine, or marijuana in the vehicle.  After the defendant denied possessing these items, the trooper asked, "Do you have any problem if I were to search to make sure that's all okay?"  The defendant agreed to such a search.  A reasonable person under the circumstances would have understood that the officer was asking for consent to search those parts of the pickup where weapons, stolen property, or illegal drugs could be hidden--including the pickup bed; and a reasonable officer in this officer's position would have believed the defendant was consenting to a search of not only the pickup cab, but also the pickup bed and any other location where drugs could be concealed.

Moreover, the defendant conversed frequently with the officer at the scene of this encounter and never verbally withdrew or limited his consent.  He said he was unable to allow

12

the officer to look at the contents of the pickup bed because he did not have the key. He never said he was unwilling to open the tonneau cover. Under such circumstances the defendant's failure to provide a key to open the tonneau cannot be construed as a withdrawal of the consent to search. United States v. Barragan, 379 F.3d 524, 530 (8th Cir. 2004)(defendants' refusal to open false compartment in vehicle did not limit or revoke their prior consent to search where they consistently stated they were not aware of the compartment's existence and did not know how to open it).

I therefore conclude defendant consented to a search of the pickup bed, did not withdraw that consent, and Trooper Goltz did not exceed the scope of the defendant's consent by detaining the vehicle for nearly an hour, attempting to and ultimately obtaining access to the contents of the pickup bed using a metal wire hanger, probing the plastic wrapped package in the pickup bed, and securing a sample of its contents. See Alcantar, 271 F.3d at 738-39 (One hour search of pickup truck did not exceed scope of consent to search vehicle for drugs and weapons, given number of places within truck where such items might have been hidden and defendants' failure to object as the search continued); United States v. Hammons, 152 F.3d 1025, 1027 (8th Cir. 1998)(Defendant's consent to search the car included consent to search closed containers that might conceal drugs, including a garment bag in the trunk); United States v. Gleason, 25 F.3d 605, 607 (8th Cir. 1994)(The defendant consented to a search of any part of his truck where a gun could be hidden, when in response to the trooper asking "Do you have any weapons in there, mind if I look?," the defendant responded "No," and when the trooper was searching areas under the truck seats, and the defendant did not object to the continuing search).

2. <u>Reasonable Suspicion/Canine Search</u>.

The defendant claims he was unreasonably detained while the officers searched his vehicle and awaited the arrival of a drug dog. Although Trooper Goltz did not initiate a traffic stop of the defendant's vehicle, at the time the vehicle stopped, he was nonetheless investigating to determine whether the vehicle was properly licensed because the plates were not in Minnesota's computer database. Trooper Goltz was justified in detaining the vehicle to obtain the defendant's identification, ask appropriate questions, and make calls or run computer checks of the information provided to assure the defendant had no outstanding warrants and the vehicle was properly licensed. Detaining the defendant for the period of time required to perform this investigation does not violate his Fourth Amendment rights. <u>United States v. Tuley</u>, 161 F.3d 513, 515 (8th Cir. 1999).

Nearly immediately after the defendant voluntarily encountered Trooper Goltz by stopping on the Giltner street and walking back to the trooper's cruiser, the defendant was asked about the license plates. He was unable to produce registration papers for the vehicle and a confirmation from Minnesota authorities that the vehicle was properly licensed did not occur until 1:31 p.m. Within ten minutes after the defendant encountered the officer, Trooper Goltz requested a drug dog because, in addition to being unable to verify the license plates, Trooper Goltz had discovered directions for driving to Albuquerque and Phoenix during his consent search of the cab despite defendant's claim that he had driven to Denver only; the defendant claimed he purchased the pickup but could not recall its mileage at the time of purchase; the defendant claimed he did not receive a key from the seller to the tonneau over the pickup bed and had never accessed that area; pickups with locked tonneau

14

covers are commonly used to transport illegal drugs; and the defendant became nervous when asked specific questions about illegal activity. Such circumstances created reasonable suspicion that criminal activity was afoot and justified detention of the vehicle for a reasonable time to await the arrival of a canine. See e.g. United States v. Morgan, 270 F.3d 625 (8th Cir. 2001)(contradictory information obtained during the course of a traffic stop created reasonable suspicion and justified continued detention of the vehicle for a dog sniff).

As the events unfolded, Trooper Goltz discovered the marijuana in the pickup bed before the canine arrived while performing a consent search. However, even had that not occurred, the detention of defendant's vehicle while awaiting the drug dog was not unreasonable.

> When police need the assistance of a drug dog in roadside Terry stops, it will in general take time to obtain one; local government police forces and the state highway patrol cannot be expected to have drug dogs immediately available to all officers in the field at all times. Courts must "consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes."

United States v. Bloomfield, 40 F.3d 910, 917 (8th Cir. 1994)(quoting United States v. Sharpe, 470 U.S. 675, 685 (1985).

Trooper Goltz promptly called for canine assistance and Trooper Korte responded by immediately securing child care and driving to Giltner with his canine partner, Maximus. At the scene, Maximus was immediately deployed and alerted to the presence of illegal drugs. The officers' response was not dilatory. They were diligent in carrying out their duties, and the length of defendant's detention was not excessive. Under

15

such circumstances, waiting approximately an hour for a drug dog to arrive was not an unreasonable detention in violation of the defendant's Fourth Amendment rights. United States v. White, 42 F.3d 457, 460 (8th Cir. 1994)(finding delay of one hour and twenty minutes for arrival of drug dog reasonable); Bloomfield, 40 F.3d at 916-17 (one hour wait from time of stop to arrest, part of which was waiting for a drug dog, was reasonable).

The defendant was already under arrest when Maximus arrived at the scene because Trooper Goltz had located the illegal drugs in the pickup bed. The defendant claims he did not consent to a search of that area, but even assuming Trooper Goltz had not received consent to search the pickup bed, the marijuana would have inevitably been discovered.

Under the inevitable discovery doctrine, evidence that would have been discovered "through independent, lawful means should be admitted so that the prosecutor is put in the same, not worse, position as though the original illegality had not occurred." United States v. Madrid, 152 F.3d 1034, 1037-38 (8th Cir. 1998)(citing Nix v. Williams, 467 U.S. 431, 442-43 (1984)). In evaluating the evidence, the focus is on what the officers would likely have done had the unlawful search not occurred. The government must prove by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation. United States v. Villalba-Alvarado, 345 F.3d 1007, 1019-20 (8th Cir 2003).

Trooper Korte and Maximus were summoned to the scene of the stop over thirty minutes before Trooper Goltz stuck a wire probe

16

into the pickup bed. In requesting canine assistance when he reasonably suspected criminal activity, Trooper Goltz was clearly pursuing an independent and legal means of determining whether illegal drugs were present in the pickup bed. Even had Trooper Goltz not perforated the plastic wrap during an allegedly illegal search of the pickup bed, Maximus would have alerted to the scent of marijuana--the plastic wrap would not have masked the odor and prevented Maximus from detecting the scent, especially given the large amount of marijuana being transported. Accordingly, the evidence of marijuana located in the pickup bed should not be suppressed because this evidence would have inevitably been discovered during the canine search. See Hammons, 152 F.3d at 1030 (assuming the defendant did not voluntarily consent to the officer opening an envelope located in the garment bag found in his vehicle trunk, the cocaine therein would have been inevitably discovered had a drug dog been called to the scene).

I therefore conclude defendant's motion to suppress based on the Fourth Amendment should be denied.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Richard G. Kopf, United States District Judge, pursuant to 28 U.S.C. §636(b)(1)(B), as follows:

   a.   Defendant's motion to suppress evidence found during the vehicle search on the basis of the Fourth Amendment, filing 17, should be denied.

   b.   Defendant's motion to suppress statements, filing 18. on the basis of the Fifth Amendment should be granted.

The parties are notified that a failure to object to this recommendation in accordance with the local rules of practice may be held to be a waiver of any right to appeal the district judge's adoption of this recommendation.

    IT FURTHER HEREBY IS ORDERED:  Trial is set to commence at 9:00 a.m. on  April 25, 2005 for a duration of three trial days before the Honorable Richard G. Kopf.  Jury selection will be at the commencement of trial.

    DATED this 28th day of March, 2005.

                                       BY THE COURT:

                                       s/ *David L. Piester*
                                       David L. Piester
                                       United States Magistrate Judge